# URS

Subcontract No.:  162001.UB

## SUBCONTRACT FOR SERVICES
("Subcontract")

This Subcontract between <u>Apollo Environmental, PO Box 12114, Beaumont, TX 77726   Phone: 409.833.3330,</u> ("Subconsultant") and URS Corporation, a Nevada corporation, Post Office Box 201088, Austin, Texas 78720-1088 Phone: 512.454.4797 ("URS"), is effective as of <u>June 15, 2007</u>. The parties agree as follows:

**ARTICLE I - Work Orders and Prime Contract.** Subcontractor's scope of Work ("Work"), the time schedule ("Schedule"), and payment terms are to be set forth in a written Work Order to this Subcontract, executed by authorized representatives of the parties. This Subcontract may, at URS' sole discretion, be made available to the subsidiaries and affiliated companies of URS. The applicable Work Order shall specify the legal name of the URS affiliate or subsidiary issuing the Work Order. The Work Order shall reference the contract ("Prime Contract") between URS and its client ("Client") pursuant to which the Work is authorized. The Prime Contract is hereby incorporated into and made a part of this Subcontract by this reference. Applicable portions of the Prime Contract shall be made available to Subcontractor as an attachment to the applicable Work Order or upon request. With respect to the Work, Subcontractor agrees to be bound to URS in the same manner and to the same extent as URS is bound to Client under the Prime Contract. In the event of conflict between a provision of the Prime Contract and this Subcontract, the provision which imposes the more stringent requirement on the Subcontractor will prevail. Performance and payment bond requirements, if any, shall be as specified in the Prime Contract or Work Order. All lower tier subcontractors shall be subject to the approval of URS.

**ARTICLE II - Payment Conditions.** Subcontractor's charges shall be specified in the Work Order. All charges shall be deemed to include all taxes and all other charges levied by any government agency on Subcontractor relating to the Work. Unless otherwise specified, the frequency of invoicing shall be monthly. Subcontractor agrees to provide such supporting documentation for each invoice as URS may reasonably require. URS shall pay each invoice properly submitted by and due Subcontractor within 15 days of the date of payment by Client to URS for work covered by Subcontractor's invoice or as required by law. In the event of non-payment by Client, both parties shall cooperate in seeking payment from Client. Final payment shall be made upon completion and acceptance of the Work by URS and Client. Payment of any invoice by URS shall not imply inspection, approval, or acceptance of the Work by URS or Client. But in no event shall payment be later than 90 days from the date of Subcontractor's invoice CP-E

**ARTICLE III - Schedule and Delays.** Time is of the essence in this Subcontract. Subcontractor shall notify URS immediately by telephone, and confirm in writing within five (5) business days, of any event or condition impairing its ability to meet the Schedule, together with proposed revisions to the Schedule. Delays caused by matters outside of Subcontractor's control shall be excusable, but shall be compensable only if additional compensation is obtained by URS from Client for such delays. Subcontractor waives any other claim for compensation based on delays.

**ARTICLE IV - Lien Waiver and Release of Claims.** As a condition precedent to URS payments hereunder, Subcontractor, upon request from URS, shall furnish lien releases, satisfactory to URS and Client. URS at any time may pay and discharge liens, claims and encumbrances filed by Subcontractor's lower tier subcontractors or suppliers and deduct the amount paid, together with costs and attorneys' fees, from compensation due Subcontractor hereunder. The acceptance by Subcontractor of the final payment under this Subcontract shall operate as a release to Client and URS for all claims and liability to Subcontractor, its representatives, lower tier subcontractors, suppliers, and assigns for any additional compensation or payment relating to any and all things done or furnished relating to the services rendered by Subcontractor in performance of the Work. Final payment shall in no way relieve the Subcontractor of liability for its obligations or for faulty or defective Work discovered after final payment.

**ARTICLE V - Changes and Additional Compensation.** URS, by written order (hereinafter "Change Order"), may make changes in the Work including, but not limited to, increasing or decreasing the Work or directing acceleration in the performance of the Work. Where practicable, URS and Subcontractor shall negotiate prior to the issuance of a Change Order the amount of any charge or Schedule change related to the Change Order. In the event the parties cannot agree, URS may issue the Change Order and the Subcontractor shall proceed with the Work. Whenever an event occurs or condition arises which Subcontractor considers a basis for additional compensation or time, Subcontractor shall so notify URS immediately by telephone, and confirm in writing within five (5) business days, after the occurrence of the event or discovery of the condition, providing detailed information to substantiate Subcontractor's position. Failure to timely comply with this requirement shall constitute a waiver of Subcontractor's claim. The liability of URS to Subcontractor for additional compensation or time related to the Change Order shall be limited to additional compensation authorized or time allowed by Client for Subcontractor's Work thereunder.

# URS

Subcontract No.: 162001.UB

**ARTICLE VI - Insurance.** Subcontractor agrees that it now carries, and will continue to carry during the performance of this Subcontract, at its own expense, the applicable insurance policies indicated below, including any coverage required by law, with limits not less than those specified. Any insurance on a "claims made" basis shall be maintained for at least 3 years after completion of the Work or any time period required by the Prime Contract, whichever is longer.

| | Required Insurance Coverage and Limits | |
|---|---|---|
| (1) | **Workers' Compensation** | **Statutory** |
| | To the extent permitted by law, a waiver of subrogation in favor of URS is required. Coverage must include, if applicable U.S. Harbor Worker's and Longshoremen's, Outer Continental Shelf, and Jones Act coverage | |
| (2) | **Employer's Liability** | **$ 1,000,000 per occurrence** |
| (3) | **Commercial General and Contractual Liability** | **$ 1,000,000 per occurrence** |
| | Must include: XCU (explosion, collapse, and underground) hazard coverage, premises operations, independent contractors, products and completed operations, broad form contractual, personal injury, and broad form property damage. Where the Work involves diving, Diver's Liability must be included. URS must be named as additional insured, which coverage shall be primary and non-contributing. | |
| (4) | **Automobile Liability** | **$ 1,000,000 per occurrence** |
| | Must include owned, non-owned, and hired vehicles. If any hazardous substances are transported must include a MCS-90 endorsement and Motor Carriers Act of 1980 coverage applicable in the jurisdiction where the operations of the insured are performed. URS must be named as additional insured, which coverage shall be primary and non-contributing. | |
| (5) | **Umbrella Liability** | **$ 2,000,000 aggregate** |
| | In excess of (1), (2), (3), and (4) above. | |
| (6) | **Pollution Liability** | **$ 5,000,000 per occurrence** _Including umbrella coverage CP._ |
| | Required if Work involves invasive Work or hazardous substances. If the Work includes asbestos abatement, Asbestos Liability must be included. If the Work includes transportation, treatment, or disposal, such activities must be insured under the policy. URS must be named as additional insured, which coverage shall be primary and non-contributing. | |
| (7) | **Professional Liability** | **$ 1,000,000 per claim / aggregate** |
| | Required if performing professional services. | |
| (8) | **Aviation Liability** | **$ 10,000,000 per occurrence** |
| | Required if using aircraft, including helicopters. Coverage must not exclude War and Terrorism coverage. URS must be named as an additional insured, which coverage shall be primary and non-contributing. A waiver of subrogation in favor of URS is required. | |
| (9) | **Marine Liability** | **$ 10,000,000 per occurrence** |
| | Required if using watercraft. Must include Charterers' Liability and Hull Protection and Indemnity. URS must be named as an additional insured, which coverage shall be primary and non-contributing. | |

Prior to the commencement of the Work, Subcontractor shall provide URS with certificates of insurance evidencing the required insurance and including the additional insured and waiver of subrogation requirements. Such certificates shall be issued by an insurance carrier(s) acceptable to URS and shall be endorsed to include thirty (30) days prior written notice of cancellation or material change in any of the coverages. Subcontractor shall include these minimum insurance requirements in its sub-subcontracts unless URS consents in writing to a deviation. The failure of URS to insist upon any requirement in this Article shall not relieve Subcontractor of its obligation to fully comply with the requirements herein.

**ARTICLE VII - Indemnification.** To the fullest extent permitted by law, Subcontractor agrees to indemnify, defend, and hold harmless URS and Client and each of their agents and employees, from any and all claims, demands, judgments, loss, damages, or liability on account of injuries, disease, or death to any person, including Subcontractor's employees (notwithstanding Workers' Compensation laws), or damage to property, or any type of claim, loss, damage, or liability whatsoever arising out of or in connection with the performance of Subcontractor's Work under this Subcontract or any actual or alleged error, omission, negligent act, statutory violation, or breach of obligation of Subcontractor, its employees, lower tier subcontractors, suppliers or agents, or release or discharge of pollutants or contaminants for which Subcontractor is strictly liable under applicable law. In addition, to the fullest extent permitted by law, Subcontractor shall indemnify, defend and hold harmless URS and Client and their employees and agents against all

**URS**

Subcontract No.: 162001.UB

liability, cost, expense, attorneys' fees, claims, loss or damage arising from any patent or copyright infringement by Subcontractor or its lower tier subcontractors or suppliers; or any lien or other claim by Subcontractor or its lower tier subcontractors or suppliers inconsistent with this Subcontract.

**ARTICLE VIII - Warranties.** Subcontractor represents that it is qualified to perform the Work and that all licenses or permits required to do the Work will be timely acquired; that Subcontractor shall comply with all applicable laws, regulations, and orders in the performance of the Work; that the Work shall be performed in a manner consistent with that level of care and skill ordinarily exercised by others performing similar Work under similar circumstances; that all goods and materials to be supplied by Subcontractor shall be of good and merchantable quality; and that the Work shall conform to the Subcontract requirements. Subcontractor shall, at its sole expense, promptly correct or replace non-conforming or defective Work. This obligation shall continue for one year after initial operation at the site or two years after delivery of the Work, whichever is later. Corrected or replaced Work shall be subject to the same warranties as, and for an additional period equal to that above. This remedy shall be in addition to all other remedies provided by law.

**ARTICLE IX - Health and Safety.** Subcontractor shall comply, and shall secure compliance by its employees, agents, and lower tier subcontractors with all applicable health, safety and security laws and regulations, including, without limitation, state and local laws and regulations, any health and safety plan issued by URS, and URS and Client rules and regulations. Compliance with such requirements shall represent the minimum standard required of Subcontractor. Subcontractor shall be responsible for examining all requirements and determining whether additional or more stringent health, safety and security provisions are required for the Work. Subcontractor agrees to comply with training and medical monitoring and certification requirements regarding its employees, agents, lower tier subcontractors and other invitees to the extent required by applicable laws, regulations, health and safety plans, and URS and Client rules and regulations, and to pay the costs and expenses thereof; and warrants that all such persons shall be fit and qualified to carry out the Work. Subcontractor agrees to furnish protective devices and clothing as required by applicable laws, regulations, health and safety plans and URS and Client rules and regulations, and to ensure that such devices or clothing are properly used by its employees, lower tier subcontractors and other invitees of Subcontractor at the job site.

**ARTICLE X - Suspension and Termination.** URS may suspend or terminate all or any part of the Work. In such event, Subcontractor shall solicit and comply with all directions given by URS concerning the suspension or termination, such as protection of the Work performed, consultations and any other matters required by URS and shall resume the suspended Work promptly after being notified by URS to do so. In the event of a suspension or a termination without cause, Subcontractor shall be compensated for Work performed prior to the suspension or termination. After receipt of a termination notice, Subcontractor, except as otherwise required by URS, shall deliver to URS all data, drawings, specifications, reports, summaries, and other information and materials prepared by Subcontractor or received from URS in the performance of the Work, whether completed or in progress.

Termination for cause shall include, without limitation: (1) failure by Subcontractor at any time to provide necessary labor, materials, supplies, equipment, utilities, facilities or supervision for the proper performance of the Work; (2) failure to correct any material defect which it is obligated to correct after being so ordered by URS; (3) substantial failure to comply with any one or more of Subcontractor's obligations under this Subcontract; (4) failure to make prompt payment to lower tier subcontractors or suppliers; (5) failure to maintain proper quality control procedures and required licensing and certification; and (6) insolvency on the part of the Subcontractor. Upon termination for cause, URS may take possession of all materials, supplies, equipment, and facilities, purchased or paid for by Client or URS and finish the Work or employ any other person or persons to finish the Work. In any such event, Subcontractor shall not be entitled to receive any further payment under this Subcontract until the Work is wholly completed, at which time, if the unpaid balance to be paid to Subcontractor under this Subcontract exceeds the cost and expense of completing the Work, the excess shall be paid by URS to Subcontractor; if such cost and expense exceeds the unpaid balance, Subcontractor shall be liable for and shall pay the difference to URS.

**ARTICLE XI - Disputes.** After first attempting to resolve disputes through good faith negotiations, the parties may pursue their respective remedies at law or equity for any claim, controversy, or dispute relating to this Subcontract, except to the extent that the Prime Contract provides otherwise. In the event that a dispute between URS and Subcontractor relates to a dispute between URS and Client, Subcontractor and URS agree to be bound by the dispute resolution procedures in the Prime Contract, and in such event, Subcontractor consents to joinder in any proceedings between URS and Client upon the request of URS. Subcontractor, however, shall not have the right to join in proceedings between URS and Client unless URS consents to the joinder.

# URS

Subcontract No.: 162001.UB

**ARTICLE XII - Confidentiality.** Subcontractor shall maintain information acquired or prepared under this Subcontract in confidence. If such information is required to be disclosed by law, Subcontractor will notify URS immediately upon receipt of such order and will reasonably cooperate with URS and Client in the event URS or Client seeks any legal protective order with respect to such information.

**ARTICLE XIII - Ownership of Documents, Patents and Copyrights.** All intellectual property developed in the performance of the Work, and all records relating to the Work, including, without limitation, all drawings, specifications, reports, summaries, samples, photographs, memoranda, notes, calculations, and other documents shall be deemed the property of URS. Subcontractor shall maintain all such materials in kind, or on microfilm, except for samples, for a period of not less than 2 years after completion of the Work, or for such longer time as may be required by the Prime Contract.

**ARTICLE XIV - Inspection and Non-Waiver.** Subcontractor shall permit the representatives of Client and URS to inspect and observe the Work at all reasonable times, and all Work shall be subject to acceptance and approval of URS and Client. Such acceptance and/or approval shall not relieve Subcontractor of its responsibility to perform the Work in accordance with all Subcontract requirements. The failure of URS to insist upon strict performance of any of the terms of this Subcontract or to exercise any rights conferred by this Subcontract shall not be construed as a waiver of its right to assert or rely on any such terms or rights on any future occasion or as a waiver of any other terms or rights.

**ARTICLE XV - Audit.** Subcontractor shall comply with accounting and audit requirements of the Prime Contract. Representatives of URS and Client shall have access, at all reasonable times, to Subcontractor's personnel job descriptions, books, records, correspondence, instructions, plans, drawings, receipts, vouchers, data stored in computers, and memoranda of every description pertaining to the Work, for the purpose of auditing and verifying the accuracy of costs and hours relating to the Work for which URS is to credit Subcontractor hereunder or for any other reasonable purpose. URS and Client's representatives shall have the right to reproduce any of the information referred to above. Subcontractor shall preserve, and shall require its lower tier subcontractors to preserve, and provide audit access to, all information referred to above for a period of not less than two (2) years after completion and acceptance of the Work or termination of the Subcontract or for the period required by the Prime Contract or by law, if longer.

**ARTICLE XVI - Notices.** Notices shall be deemed to have been sufficiently given if in writing and delivered either personally or by mail to the authorized representative of the other party; notices given by mail shall also be transmitted by facsimile at the time of mailing. In the absence of specifically-designated authorized representatives, the signatories to this Subcontract shall be authorized representatives.

**ARTICLE XVII - Compliance With Law and EEOC Compliance.** In performance hereunder, and every activity connected therewith, Subcontractor shall comply fully with all applicable laws, ordinances, rules and regulations, and when requested, shall furnish evidence satisfactory to URS of such compliance. In addition, Subcontractor shall comply with the then current provisions of the Equal Opportunity Clause at 41 CFR § 60-1.4(a), 41 CFR § 60-250.5(a) and 41CFR § 60-741.5(a) which are hereby incorporated by reference.

**ARTICLE XVIII - Integrated Writing.** This Subcontract constitutes the entire agreement between URS and Subcontractor and supersedes all prior or contemporaneous communications, representations, or agreements, oral or written, with respect to its subject matter. No agreement hereafter made between the parties shall be binding on either party unless reduced to writing and signed by the parties authorized representatives.

**THE PARTIES ACKNOWLEDGE** that there has been an opportunity to negotiate the terms and conditions of this Subcontract and agree to be bound accordingly.

# URS

Subcontract No.:    **162001.UB**

| APOLLO ENVIRONMENTAL | URS CORPORATION, a Nevada corporation |
|---|---|
| *[signature]* | *[signature]* |
| Signature | Signature |
| Andy Elms | Joy G. Nash, Procurement Specialist |
| Typed Name/Title | Typed Name/Title |
| 6-15-07 | 6-29-07 |
| Date of Signature | Date of Signature |

## SUBCONTRACT FOR SERVICES
("Subcontract")

### WORK ORDER NUMBER 162002.US

In accordance with the Subcontract for Services ("Subcontract") between **Apollo Environmental** ("Subcontractor"), and **URS Corporation, a Nevada corporation** ("URS"), dated **June 15, 2007**, this Work Order describes the Work, Schedule, and charges and payment conditions for the Subcontractor's Work on the Project known as:

### 25009529 / Phase II ESA, Beaumont, TX

**Subcontractor Authorized**
**Representative:** Andy Elms
**Telephone No:** Phone: 409.833.3330
**Address:** PO Box 12114, Beaumont, TX 77726

**URS Authorized**
**Representative:** Buyer: Joy G. Nash        Technical: Tony Dworaczyk
**Telephone No:** 512.419.6827                            713.914.6392
**Address:** Post Office Box 201088, Austin, Texas 78720-1088

**Work.** The Work shall be described in **Attachment 1** to this Work Order. Subcontractor shall perform the Work under the general direction of URS and shall furnish all labor, materials, supplies, equipment, supervision and services necessary for and incident to the performance of the Work. Subcontractor represents that it has thoroughly reviewed the Work and the Prime Contract and that it accepts the Work and the conditions under which the Work is to be performed.

**Schedule.** The Schedule shall be **June 15, 2007 through December 31, 2007**. Subcontractor represents that the Schedule is reasonable.

**Payment.** The basis for determining the amount of charges, the frequency of billing, and special payment conditions shall be set forth on **Attachment 2** to this Work Order.

**Prime Contract.** The Prime Contract, if applicable, is included as **Attachment 3** to this Work Order.

**Terms and Conditions.** The terms and conditions of the Subcontract referenced above shall apply to this Work Order.

ACCEPTANCE of the terms of this Work Order is acknowledged by the following signatures of the Authorized Representatives of the parties to the Work Order.

**APOLLO ENVIRONMENTAL**                                **URS CORPORATION, a Nevada corporation**

_____                       _____
Signature                                               Signature

_____Andy Elms_____                       **Joy G. Nash, Procurement Specialist**
Typed Name/Title                                        Typed Name/Title

_____6-15-07_____                        _____6-29-07_____
Date of Signature                                       Date of Signature

**URS**

Subcontract No.: 162001.UB

## ATTACHMENT 1

## WORK

Subcontractor shall provide environmental drilling services as outlined in Subcontractor's Proposals dated May 29, 2007, Attached hereto.

ϑ2υ0υ

# APOLLO®
## ENVIRONMENTAL STRATEGIES, INC.

May 29, 2007

Mr. Tony Dworaczyka
URS Corp.
9801 Westheimer, Suite 500
Houston, TX 77042

Re: Environmental Drilling Services at Triangle Marine Industrial Park, Beaumont, TX.

Dear Sir:

APOLLO® Environmental Strategies, Inc. (APOLLO®, Texas Driller's License No. 51497M) is pleased to submit this proposal for environmental drilling services to be conducted at the above referenced location. It is understood that the scope of work consists of the following.

1. Advance 30 borings with continuous soil sampling through soil to a depth of approximately 15 to 20 feet with a combination direct-push rotary drill rig using a split spoon sampler. Submit soil samples to the on site URS representative.

2. Convert each boring to a temporary monitor well by installing one inch PVC into the bore hole with sand pack and bentonite seal only.

3. Sample groundwater from each temporary monitor well using a peristaltic pump and submit the samples to the URS on site representative. Sample containers, labeling, custody control, and other sample management will be provided by URS.

4. Upon completion of sampling, remove temporary well casings and plug all bore holes with bentonite.

5. Decontaminate sampling and drilling tools and equipment prior to advancing each boring.

6. Containerize all cuttings, decon water, and related wastes into 55 gallon drums which will remain on site for management by others.

7. Complete and submit a State of Texas plugging report for each boring/temporary monitor well.

The estimated charges for the personnel and equipment expected to be used are given below.

Mobilization and demobilization .................................................................................. $150.00
Drill Rig w/ crew, service vehicle, equipt. trailer, decon, and drilling tools @
$1,600.00/day, estimated 6 days ..................................................................................$9,600.00
   (Up to 10 hour work day, $800.00 per ½ day)

222 N. Story Road
Suite #130
Irving, Texas 75061
972.313.7866

● 800.742.1033 ●

P.O. Box 12114
Beaumont, Texas 77726
409.833.3330

02000

# APOLLO ®
## ENVIRONMENTAL STRATEGIES, INC.

Decontamination of equipment $75.00/day, estimated 6 days........................ $450.00
55 Gallon drums, estimated 6 @ $48.00 each ........................................ $288.00
Monitor well sampling equipment $75.00/day, estimated 6 days ................... $450.00
Soil and groundwater sampling, temporary monitor well construction,
    and other expendable materials, estimated ................................... $1,350.00
Total Estimated Charges                                                          $12,288.00

The above listed pricing is based on the information provided by you and does not include delays caused by others or due to circumstances beyond the control of APOLLO® e.g., difficult access, relocation of boring sites, excessively resistant, collapsing, or heaving formations, concrete coring, rubble, or debris, inclement weather, etc. It is understood that URS Corporation has obtained permission from the appropriate land owner(s) to access the subject property to install and sample borings/temporary monitor wells and URS Corporation is responsible for properly notifying the appropriate parties and locating and clearly marking all underground utilities and other hazards. APOLLO® will not be responsible for any damage to any unmarked, unidentified, or mis-marked underground property nor any third party liability as a result of damage.

If the above described scope of work and terms and conditions are acceptable, please acknowledge by signing below and returning this letter agreement to me.

Please contact me at (800) 742-1033 if you have any questions or comments. Thank you for your consideration and we look forward to working with you.

Sincerely,                                              Accepted by:


Andy Elms                                               _____
APOLLO® Environmental Strategies, Inc.                  URS Corp. Authorized Signature
Texas Driller's License No. 51497M
                                                        _____
                                                        Printed Name


222 N. Story Road
Suite #130
Irving, Texas 75061                                                     P.O. Box 12114
972.313.7866                    • 800.742.1033 •                        Beaumont, Texas 77726
                                                                        409.833.3330

01000

# APOLLO ®
ENVIRONMENTAL STRATEGIES, INC.

May 29, 2007

Mr. Tony Dworaczyka
URS Corp.
9801 Westheimer, Suite 500
Houston, TX 77042

Re:    Environmental Drilling Services at DuPont Chemical Complex, Beaumont, TX.

Dear Sir:

APOLLO® Environmental Strategies, Inc. (APOLLO®, Texas Driller's License No. 51497M) is pleased to submit this proposal for environmental drilling services to be conducted at the above referenced location. It is understood that the scope of work consists of the following.

1. Advance 15 borings with continuous soil sampling through soil to a depth of approximately 15 to 20 feet with a combination direct-push rotary drill rig using a split spoon sampler. Submit soil samples to the on site URS representative.

2. Convert each boring to a temporary monitor well by installing one inch PVC into the bore hole with sand pack and bentonite seal only.

3. Sample groundwater from each temporary monitor well with a peristaltic pump and submit the samples to the URS on site representative. Sample containers, labeling, custody control, and other sample management will be provided by URS.

4. Upon completion of sampling, remove temporary well casings and plug all bore holes with bentonite.

5. Decontaminate sampling and drilling tools and equipment prior to advancing each boring.

6. Containerize all cuttings, decon water, and related wastes into 55 gallon drums which will remain on site for management by others.

7. Complete and submit a State of Texas plugging report for each boring/temporary monitor well.

The estimated charges for the personnel and equipment expected to be used are given below.

Mobilization and demobilization ........................................................................... $150.00
Drill Rig w/ crew, service vehicle, equipt. trailer, decon, and drilling tools @
$1,600.00/day, estimated 3 days ........................................................................ $4,800.00
   (Up to 10 hour work day, $800.00 per ½ day)

222 N. Story Road
Suite #130                                                                      P.O. Box 12114
Irving, Texas 75061                                                           Beaumont, Texas 77726
972.313.7866                        • 800.742.1033 •                           409.833.3330

0100

# APOLLO®
## ENVIRONMENTAL STRATEGIES, INC.

| | |
|---|---|
| Decontamination of equipment $75.00/day, estimated 3 days | $225.00 |
| 55 Gallon drums, estimated 3 @ $48.00 each | $144.00 |
| Monitor well sampling equipment $75.00/day, estimated 3 days | $225.00 |
| Soil and groundwater sampling, temporary monitor well construction, and other expendable materials, estimated | $675.00 |
| Total Estimated Charges | $6,219.00 |

The above listed pricing is based on the information provided by you and does not include delays caused by others or due to circumstances beyond the control of APOLLO® e.g., difficult access, relocation of boring sites, excessively resistant, collapsing, or heaving formations, concrete coring, rubble, or debris, inclement weather, etc. It is understood that URS Corporation has obtained permission from the appropriate land owner(s) to access the subject property to install and sample borings/temporary monitor wells and URS Corporation is responsible for properly notifying the appropriate parties and locating and clearly marking all underground utilities and other hazards. APOLLO® will not be responsible for any damage to any unmarked, unidentified, or mis-marked underground property nor any third party liability as a result of damage.

If the above described scope of work and terms and conditions are acceptable, please acknowledge by signing below and returning this letter agreement to me.

Please contact me at (800) 742-1033 if you have any questions or comments. Thank you for your consideration and we look forward to working with you.

Sincerely,                                          Accepted by:


Andy Elms
APOLLO® Environmental Strategies, Inc.              _____
Texas Driller's License No. 51497M                  URS Corp. Authorized Signature

                                                    _____
                                                    Printed Name

222 N. Story Road
Suite #130
Irving, Texas 75061                                                 P.O. Box 12114
972.313.7866                                                        Beaumont, Texas 77726
                         • 800.742.1033 •                           409.833.3330

**URS**

Subcontract No.: 162001.UB

## ATTACHMENT 2

## PAYMENT

<table>
<tr><td rowspan="2">All Work Orders</td><td>

Duplicate invoices shall be submitted separately for each Work Order to:

URS, Attn: Patrick Clogan
Post Office Box 201088
Austin, Texas 78720-1088
Fax Number: 512.419.6983

**Invoices submitted without the Work Order Number and Project Number will not be deemed acceptable and will be returned to Subcontractor.**

If more than one item appears on the Work Order, invoices will be prepared separately, providing separate job records are maintained for each item. Subcontractor shall forward an invoice to URS monthly covering all sums payable to Subcontractor hereunder for the month preceding the month in which such invoice is sent to URS. Invoices submitted shall show:

1. Work Order Number and Project Number
2. Breakout at the Work Order level showing:
    i. Detailed charges for labor
    ii. Other reimbursable expenses, itemized separately
    iii. Purchased services (if authorized)

No charges will be paid by URS at rates other than those contained in the Work Order.

It is specifically agreed that Subcontractor's price includes all charges for completion of the Statement of Work contained herein, inclusive of all taxes. No charges of any kind will be allowable beyond the stated Price Limitation.

Precontract costs as defined in FAR 31.205-32 are allowable to the extent that they would have been allowed if incurred after the effective date of the Work Order.

Subcontractor shall submit its final invoice promptly upon completion of the work, but in no event later than sixty (60) days from the ending Period of Performance/Scheduled End Date as stated herein. URS shall have no responsibility or liability for payment to Subcontractor if Subcontractor fails to submit its final invoice within the sixty (60) day period.

URS shall not be liable for payment in excess of the applicable Work Order Value unless and until such time as URS shall have authorized a revision to that amount in writing.

</td></tr></table>

<table>
<tr><td>Fixed Unit Price</td><td>

The Price Limitation of this Work Order is **$18,507.00**.

For Work Orders issued on a fixed unit price basis, Subcontractor shall provide URS with the cost estimate, in such detail as is mutually agreed upon by the parties.

Payment terms for each fixed unit price Work Order shall be as follows:

1. Subcontractor agrees to undertake and to exert its best efforts to accomplish the project within the mutually agreed period of performance/schedule stated in the Work Order and within a not-to-exceed budget specified in the Work Order. Subcontractor will limit its project expenditures to the not-to-exceed budget amount and

</td></tr>
</table>

**URS**

Subcontract No.: 162001.UB

<table>
<tr><td rowspan="4">Fixed Unit Price (Continued)</td><td colspan="4">terminate work, unless a revised budget has been mutually established and made a part of the Work Order in writing. If total charges for the project are less than the total amount authorized in the Work Order, URS will be billed for only the total charges so accrued.</td></tr>
<tr><td>2</td><td colspan="3">For Work Orders issued on a fixed unit price basis, URS agrees as described herein, to pay Subcontractor the charges to the project, subject to a not-to-exceed dollar limit. Charges shall be in accordance with those in the Work Order incorporated herein by this reference.</td></tr>
<tr><td>3.</td><td colspan="3">Unit Rates:</td></tr>
<tr><td></td><td>Per rates outlined in Rate Schedule, Attached hereto.</td><td></td><td></td></tr>
</table>

Pgs 15/23 to 22/25 intentionally missing due to APOLLO confidential pricing

# SUPPLEMENTAL TERMS AND CONDITIONS TO SUBCONTRACTS ISSUED UNDER THE TEXAS EASTMAN COMPANY SPECIAL TERMS AND CONDITIONS FOR PROFESSIONAL SERVICES

The following clauses are from URS' contract with Texas Eastman that are applicable to Subcontractor and any lower tier subcontractors. In these clauses wherever reference is made to "Engineer" substitute "Subcontractor" and wherever "Eastman" appears substitute "URS and/or Eastman" wherever necessary or desirable to protect the interests of either URS or Eastman.

### ARTICLE 11. INSURANCE

Engineer and all of its subcontractors shall place and maintain with responsible insurance carriers the following insurance. As evidence of this insurance, Engineer shall deliver to Eastman certificates of insurance which shall provide thirty days notice to be given to Eastman in the event of a cancellation.

A.  Workers' Compensation and Employer's Liability Insurance
    Workers' Compensation in compliance with the applicable state and federal laws.

    Employer's Liability - Limit $100,000

B.  Comprehensive General Liability Insurance including Blanket Contractual, Excavation, Collapse and Underground, Hazards, Broad Form Property Damage, Completed Operations and Independent Contractor's Liability all applicable to Personal Injury, Bodily Injury and Property to a combined single limit of $1,000,000 each occurrence subject to $2,000,000 annual aggregate for Completed Operation and Personal Injury other than Bodily Injury. Such aggregate for Personal Injury and Products/Completed Operations shall apply separately with respect to each project away from Engineer's owned or rented premises.

C.  Comprehensive Automobile Liability Insurance including owned, hired and no owned automobiles, Bodily Injury and Property Damage to a combined single limit of $1,000,000 each occurrence.

D.  Architects and Engineers Professional Liability Insurance. Affording professional liability, if any, to a combined single limit of $1,000,000 each occurrence/claim, subject to $2,000,000 annual aggregate.

E.  Excess Liability Insurance. Excess liability following employers' liability afforded by item (A) and other coverages afforded by items (B), (C) and (D) set forth above, subject to a combined single limit of $5,000,000 each occurrence/claim/aggregate.

### ARTICLE 16. OWNERSHIP OF DOCUMENTS.

If Engineer prepares documents, maps, photographs, drawings and specifications in connection with the work, Eastman shall own same and shall have the right to use them on this project provided that Eastman has paid Engineer for such preparation Reuse of any such materials by Eastman on any alteration or extension of this project or any other project without Engineer's written authorization shall be at Eastman's sole risk and without liability to Engineer. Engineer shall have the right to retain copies of all such materials and to reuse such materials (provided that such materials do not contain any proprietary information of Eastman's) on other projects at Engineer's sole risk. The work to be performed under this contract is solely for the benefit of Eastman. No third party shall have the right to rely on Engineer opinions rendered in connection with the work without the written consent of Engineer and the third party's agreement to be bound to the same conditions and limitations as Eastman.